John **BOHACH** and Jon Catalano, Plaintiffs,

v.

The **CITY OF RENO**, Jim Weston, Kim Gibson and Robert McDonald, Defendants.

No. CV–N–96–403–ECR.

United States District Court, D. Nevada.

July 23, 1996.

Robert R. Hager, Reno, NV, Everett L. Bobbitt, San Diego, CA, for plaintiffs.

Carolyn Cramer and Karen Fraley, Deputy City Attorneys, Police Department, Reno, NV, for defendants.

*ORDER*

EDWARD C. REED, Jr., District Judge.

Mr. Bohach and Mr. Catalano are officers of the Reno Police Department. In early 1996, they sent messages to one another, and to another member of the Department, over the Department's "Alphapage" message system. Faced with an internal affairs investigation based on the contents of those messages, they filed this lawsuit, claiming that both the storage of the messages by the Department's computer network, and their subsequent retrieval from the computer's files, were violations of the federal wiretapping statutes and of their constitutional right to privacy. They sought to stop the investigation and to bar any disclosure of the contents of the messages. Doc. # 1. As they were to be interrogated almost immediately, we issued a temporary restraining order. Doc. # 4. After a hearing, we dissolved the restraining order and refused to issue a preliminary injunction. Doc. # 18.

Officers Bohach and Catalano have taken an interlocutory appeal and ask that the court's decision denying the injunction be suspended under Rule 62(c). That amounts to a request that their motion for an injunction, having been denied, in effect be granted pending resolution of the appeal. Doc. # 19. This would bar the Reno Police Department from conducting an internal affairs investigation, and interference by a federal court in the internal operations of a state or local government is an exceptional matter. We therefore gave the City an opportunity to respond to the plaintiffs' Rule 62 motion, and it has done so. Doc. # 28.

I. *Facts*

According to Patricia Marcuerquiaga, the Reno Police Department's computer administrator, "Alphapage" is a software program, installed on the Reno Police Department's Local Area Network ("LAN") computer system, which allows the transmission of brief alphanumeric messages to visual display pagers. *See* Doc. # 13, Exh. A. (Such pagers thus differ from the more familiar "tone-only" variety, which merely emit a " 'beep' or other signal to inform the user that a mes-

**1234**

sage is waiting." 1 Clifford S. Fishman & Anne T. McKenna, *Wiretapping and Eavesdropping* § 3:23 (2d ed. 1995).) The software, formally styled the "Alphapage Media Notification System," was installed on the system in mid–1994. According to a standing order issued at that time by Richard Kirkland, who was then Chief of the Reno Police Department, Doc. # 13 Exh. E, the purpose was to allow the broadcast of "mini news releases" and other "timely information" to the media by means of the pagers (between 40 and 70 pagers were then held by members of the press) and thus to free up the Department's regular telephone lines. The order warned all users that "[e]very Alphapage message is logged on the network," and prohibited some types of messages (e.g., those containing comment on Department policy, and those whose contents violated the Department's anti-discrimination policy).

The system's mechanical details are fairly simple, at least from the user's standpoint. Alphanumeric or voice messages can be sent on the Alphapage system by telephone, by "stand-alone" keyboard, or by means of the LAN computer system. We pass over the first two methods of transmission and the matter of voice messages. All the messages at issue in this case were alphanumeric (no human voice was involved). And all, it seems, were sent to the recipient's pager from a computer terminal, rather than by telephone or "stand-alone" keyboard; we assume that this is so because the latter methods of transmission, according to the City's expert, would have left no permanent record in the computer.

Use of the Alphapage system by means of the computer system proceeds roughly as follows. The user logs on to any Reno Police Department computer terminal and selects Alphapage from the menu of available functions, and then selects, from a list of all persons to whom pagers have been issued, the name of the person to whom the message

is to be sent. The user then types the message and hits the "send" key. The message is sent to the computer system's "Inforad Message Directory," where it is stored in a server file, and the user receives a message on the computer screen indicating that the page is being processed. The computer then dials the commercial paging company, sends the message to the company by modem, and disconnects. The user receives a "page sent" message on the computer screen, and the paging company takes over, sending the message to the recipient pager by radio broadcast.

## II. *Fourth amendment*

■ Officers Bohach and Catalano can succeed on their § 1983 fourth amendment claim only if, at a minimum, they demonstrate that they had a reasonable expectation of privacy in their use of the Alphapage system. We assume that they did indeed have a subjective expectation of privacy, if only because we cannot believe that, had they thought otherwise, they would ever have sent over the system the sorts of messages they did send. The question is whether their expectation was objectively reasonable. Based on the evidence now available, we think that is most unlikely.

To begin with, all messages are recorded and stored not because anyone is "tapping" the system, but simply because that's how the system works. It is an integral part of the technology, and in this respect Alphapage is like most pager systems, which store messages in a central computer until they are retrieved by, or sent to, the intended recipient.[1] Moreover, while one phase of an Alphapage transmission (from the pager company to the recipient pager) may involve a radio broadcast, the earlier phase at issue here (from the user's keyboard to the computer) is essentially electronic mail—and e-mail messages are, by definition, stored in a routing computer.[2]

---

**1.** *See* Fishman, *Wiretapping, supra,* § 3:23 at 3–30 ("'[d]isplay' pagers are equipped with screens that can display visual messages.... The person seeking to make contact with the user is instructed to provide a message ...; this message is stored by the paging company's computer until it can be read directly by the user").

**2.** How many employees understand that this is so is unclear. *See* Larry O. Natt Gantt II, *An Affront to Human Dignity: Electronic Mail Moni-*

That only a diminished expectation of privacy would be reasonable in this case is also suggested by then-Chief of Police Kirkland's order, issued when Alphapage was first installed and long before the messages in this case were sent, notifying all users that their messages would be "logged on the network" and that certain types of messages (e.g., those violating the Department's antidiscrimination policy) were banned from the system. Now, that is not the same thing as saying that the contents of all messages will be recorded and retained, but it suggests that one should expect less privacy on Alphapage than on, say, a private telephone line. We note, also, that Alphapage is accessible to anyone with access to, and a working knowledge of, the Department's computer system. No special password or clearance is needed. The current Chief of the Reno Police Department, James Weston, testified that the Department's janitor, if he had general access to the computer system, could roam at will through Alphapage.

Finally, and more generally, we note that police stations often record all outgoing and incoming phone calls, "for a variety of reasons: to make sure that their dispatches are accurate, to verify information, and to keep a log of emergency and nonemergency calls." Fishman, *supra*, § 2:38 & n. 28 (collecting cases); *see In re State Police Litigation*, 888 F.Supp. 1235, 1262–66 (D.Conn.1995); *George v. Carusone*, 849 F.Supp. 159, 164 (D.Conn.1994). This may or may not violate the wiretapping statutes, depending upon how it is done. For fourth amendment purposes, however, the point is that the practice is part of the "ordinary course of business" for police departments, and it is all the more reasonable in this case in light of Alphapage's purpose and limitations. Unlike a telephone, the system is not designed to communicate with the public generally. It was installed to allow communications among police personnel, and between police personnel

and the press, about police matters; that it can be used to send private communications between police personnel is incidental to its primary function. Further, unlike a telephone line, Alphapage can be used to communicate only with a recipient who has an Alphapage pager, i.e., a member of the Department or the press. So, while officers Bohach and Catalano attempt liken their communications to private telephone calls, we think that some aspects of the system (its primary though not exclusive purpose, the restrictions placed on the contents of messages, the limited number of persons with whom one can communicate using it, and the fact that police departments routinely and properly record their communications with the public) suggest that one should expect, when using it, less privacy than one might expect when, say, making a private telephone call, even from a police station.

### III. *Statutory claims*

▮ The federal wiretapping statutes cover "wire," "oral" and "electronic" communications. The messages at issue here were "electronic" communications within the meaning of 18 U.S.C. § 2510(12). (They did not involve a human voice and thus were not "wire" or "oral" communications. *See* § 2510(1), (2), (18).) An "electronic communication" consists of the "transfer" of the signals, data, and other items listed at § 2510(12), but does not include their "electronic storage." An electronic communication may be put into electronic storage, but the storage is not itself a part of the communication. *Steve Jackson Games, Inc. v. United States Secret Service*, 36 F.3d 457, 461–62 (5th Cir.1994); *compare* § 2510(1) (a "wire communication" is both a transfer *and* electronic storage of the communication). The statutes therefore distinguish the "interception" of an electronic communication at the time of transmission from the retrieval of

---

*toring in the Private Sector Workplace*, 8 Harv.J.L. & Tech. 345, 349 (1995) ("[m]any employees remain unaware that ... the central computer routing the messages stores the transmission in unencrypted plain text files, available to the service provider whether that be a third-party common carrier or the employer itself"); *but see* Laurie Thomas Lee, *Watch Your E–Mail! Em-*

*ployee E–Mail Monitoring and Privacy Law in the Age of the "Electronic Sweatshop"*, 28 J. Marshall L.Rev. 139, 148 (1994) ("an employee's privacy interest in E-mail messages" would likely "fail the 'expectation of privacy' test since most users probably realize that a system administrator could have access to their E-mail").

such a communication after it has been put into "electronic storage." Interceptions are covered by §§ 2510–22, and access to information in electronic storage by §§ 2701–11.[3]

■ Section 2511(1)(a) forbids, among other things, the interception of electronic communications. An "interception" is the "acquisition of the contents of any ... electronic ... communication through the use of any electronic, mechanical or other device." § 2510(4). One might ask how any "interception," as the word is usually understood, could be thought to have occurred here. After all, no computer or phone lines have been tapped, no conversations picked up by hidden microphones, no duplicate pager "cloned" to tap into messages intended for another recipient. Compare Brown v. Waddell, 50 F.3d 285 (4th Cir.1995) (clone pagers); Jackson v. State, 636 So.2d 1372 (Fla.Dist.Ct.App.1994), aff'd 650 So.2d 24 (Fla.1995) (same).

This view is supported by both the statute and the nature of the pager system's operation. To begin with, we think no one would object if the computer were just a passive conduit for a communication, on its way from the sender's keyboard to the pager company and on to recipient's pager. After all, if the computer received an electronic communication from a terminal and passed it on to the pager company, but did not store or otherwise record its contents, it would not have acquired "information concerning the [communication's] substance, purport, or meaning," and therefore no "intercept" would have taken place. (And if there were an intercept, consent would likely be implied under § 2511(2)(c), for one who sends a message using a computer surely must understand that the message will pass through the computer.)

Indeed, we do not understand the plaintiffs to object to the mere passage of their messages through the computer. Their com-

plaint, as we understand it, is that the computer stored (or recorded, or downloaded) the contents of those messages. And that, we think, is where their argument breaks down. The computer's storage of an electronic communication, whether that storage was "temporary" and "intermediate" and "incidental to" its impending "electronic transmission," or more permanent storage for backup purposes, was "electronic storage." An "electronic communication," by definition, cannot be "intercepted" when it is in "electronic storage," because only "communications" can be "intercepted," and, as the Fifth Circuit held in Steve Jackson Games, the "electronic storage" of an "electronic communication" is by definition not part of the communication. The treatment of messages in "electronic storage" is governed by §§ 2701–11, not by the restrictions on "interception" set out at §§ 2501–22.

■ This leads us to the plaintiffs' claim that the City acted unlawfully when, months after the messages were sent, it accessed and retrieved them from storage in the computer. The problem with the claim is simple. The City is the "provider" of the "electronic communications service" at issue here: the Reno Police Department's terminals, computer and software, and the pagers it issues to its personnel, are, after all, what provide those users with "the ability to send or receive" electronic communications. But § 2701(c)(1) allows service providers to do as they wish when it comes to accessing communications in electronic storage. Because the City is the provider of the "service," neither it nor its employees can be liable under § 2701.

## IV. Conclusion

The plaintiffs have not established that they had an objectively reasonable expectation of privacy in the messages at issue. To the extent that the computer acted as a mere

**3.** See Thomas R. Greenberg, Comment, E–Mail and Voice Mail: Employee Privacy and the Federal Wiretap Statute, 44 Am.U.L.Rev. 219, 247–48 (1994) ("the distinction between the terms 'intercept' and 'access' ... is critical when a transmitted communication is later electronically stored.... This is the case with both E-mail and voice mail messages, both of which have a transmission phase and a storage phase. During the

transmission phase, any protection against unlawful interception ... is governed by § 2511. On arrival in storage, the same messages are subject to § 2701"); see also Gantt, supra, at 355; Julia Turner Baumhart, An Employer's Right to Read Employee E–Mail: Protecting Property or Personal Prying?, 8 Lab.Law. 923, 929 (1992).

conduit of their messages to one another, we do not understand the plaintiffs to complain, and in any event we that think no "interception" occurred; even if there had been an interception, we would likely find implied consent in light of the plaintiffs' decision to send those messages via the computer. We understand the plaintiffs' real complaint to be that their messages were recorded and stored in, and later retrieved from, the computer. But the initial act of storage was "electronic storage," and the applicable statutes are therefore §§ 2701–11 rather than §§ 2501–22. Under those statutes, the City, as the system provider, was free to access the stored messages as it pleased. The injunction was properly denied, and there is no reason to suspend that denial pending resolution of the plaintiffs' appeal.

**IT IS THEREFORE HEREBY ORDERED** that the plaintiffs' **motion (Doc. # 19)** pursuant to Fed.R.Civ.P. 62 is **DENIED.**

**IT IS FURTHER ORDERED** that the court's prior **order (Doc. # 21),** enjoining the City's actions pending further order of this court, is **VACATED,** and the City is free to proceed.